IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| DAN ARENBERG,<br><br>   Plaintiff,<br><br>  v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.; RENTGROW, INC. and APPFOLIO, Inc.,<br><br>   Defendants. | Civil Action No.:<br><br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Dan Arenberg ("Plaintiff" or "Mr. Arenberg") a living, breathing 70-year-old consumer, brings this action on an individual basis, against Defendants Experian Information Solutions, Inc. ("Experian"), RentGrow, Inc. ("RentGrow"), and Appfolio, Inc. ("Appfolio") (collectively, the "Defendants") and states as follows:

**INTRODUCTION**

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, consumer reporting agencies acknowledge this potential for

misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual

2

> is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's consumer report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining retail credit, housing, a mortgage, etc.

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is

completed.

11.     Plaintiff's claims arise out of Defendants' blatantly inaccurate reporting, wherein Defendants reported to Plaintiff's potential creditors (including Plaintiff's prospective landlord and USAA Federal Savings Bank) that he is "deceased."

12.     Accordingly, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's consumer reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

13.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

14.     Dan Arenberg ("Plaintiff" or "Mr. Arenberg") is a natural person residing in Plano, Texas and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation doing business throughout the United States, including the State of Texas and in this District. Experian has a principal place of business located at 701 Experian Parkway, Allen, Texas 75013 and can be served through its registered agent, c/o C T Corporation System, located at 330 North Brand Boulevard, Glendale, California 91203.

16.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

17.     Defendant RentGrow, Inc. ("RentGrow") is a Delaware corporation doing business

4

throughout the United States, including the State of Texas and in this District, and has a principal place of business located at 400 5th Avenue, Suite 120, Waltham, Massachusetts 02451. RentGrow can be served through its registered agent, c/o Corporation Service Company, located at 84 State Street, Boston, Massachusetts 02109.

18.     Among other things, Defendant RentGrow sells consumer reports, often called tenant screening reports, to mortgage brokers, property management companies, and landlords for their use in deciding whether to rent or otherwise offer housing to a prospective tenant. These reports are provided in connection with a business transaction initiated by the consumer.

19.     Defendant RentGrow is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for tenant screening purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

20.     Defendant Appfolio, Inc. ("Appfolio") is a Delaware corporation doing business throughout the United States, including the State of Texas and in this District, and has a principal place of business located at 70 Castilian Drive, Santa Barbara, CA 93117. Appfolio can be served through its registered agent, c/o Corporation Service Company, located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

21.     Among other things, Defendant Appfolio sells consumer reports, often called tenant screening reports, to mortgage brokers, property management companies, and landlords for their use in deciding whether to rent or otherwise offer housing to a prospective tenant. These reports are provided in connection with a business transaction initiated by the consumer.

22.     Defendant Appfolio is a consumer reporting agency as defined in 15 U.S.C. §

5

1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for tenant screening purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

25. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

26. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports" or "background reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

27. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with

regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

28.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

29.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Defendants' Practices Concerning the Sale of Reports on the "Deceased"**

30.     Defendants sell thousands, if not, millions of consumer reports (often called "credit reports," "background reports," "tenant screening reports," or "reports"), and also sell credit and/or rental scores.

31.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

32.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate 'permissible purposes."

33.     Defendants routinely place a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, or other consumer reporting agencies, etc.) that a given consumer is deceased.

34. Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's file.

35. Defendants do not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

36. Defendants do not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

37. In some cases, in order to assure accuracy, Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendants do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when a deceased notation is placed in said consumer's file or report.

38. The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**. The DMF is also known commercially as the Social Security Death Index (SSDI). The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA. The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

39.    Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefit paying agencies.

40.    Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the **Limited Access Death Master File (LADMF)** electronically on a weekly and monthly basis.

41.    The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies. The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF. The SSA does not guarantee 100% of the data.

42.    The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[1] [2]

43.    The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[3]

---

[1] *Aviva Dekornfeld (2018-06-20). "The Plight of the Living Dead". The Indicator from Planet Money (Podcast).*

[2] Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio*.

[3] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov*. 2016-03-24. Archived from the original on 2020-07-16.

44. Upon information and belief, Defendants do not have access to the full DMF from the SSA, but rather are subscribers to the NTIS LADMF.

45. Upon information and belief, despite being subscribers of the NTIS LADMF, Defendants do not cross-reference the deceased notation received from its data furnishers with the LADMF in order to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF *before* selling a consumer report about said consumer, or at any time.

46. Upon information and belief, Defendants will only cross-reference the NTIS LADMF to sell additional products for an additional fee to their subscribers regarding information contained within the LADMF.

47. Defendants fail to employ reasonable procedures that assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

48. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

49. Even in instances where the purportedly deceased consumer communicates directly with Defendants, Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

50. Further, once a "deceased" mark is placed upon a consumer's report, consumer reporting agencies like Defendants will not calculate and will not provide a credit or rental score for that consumer.

10

51.     Upon Defendants' reports with a "deceased" mark sold to third parties, Defendants never calculate or provide a credit and/or rental score for that consumer and instead report that consumer's credit or rental score as "N/A" or "unavailable."

52.     Defendants know that third party credit issuers, landlords, etc. require a credit or rental score in order to process a given consumer's application.

53.     Defendants know that consumers without credit or rental scores are often unable to secure any credit from most credit issuers or be approved by most landlords.

54.     Defendants know that living consumers are routinely turned down for credit (such as credit cards, loans, and rental units) specifically because they are reporting them as "deceased" and/or without a credit score.

55.     Defendants have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendants are inaccurately reporting them as "deceased."

56.     Defendants have received and documented many disputes from consumers complaining that Defendants had erroneously marked them as "deceased" on their consumer reports.

57.     Defendants know that thousands of consumers are erroneously marked as "deceased" on their consumer reports when said consumers are not on the Social Security Administration's Death Master File and are in fact alive.

58.     Nevertheless, Defendants do not employ any procedures to assure that a consumer marked as "deceased" on their consumer reports is in fact deceased.

59. Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the deceased reporting decides to modify its reporting.

60. Defendants do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

61. Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

62. Instead, Defendants will continue to sell consumer reports about that "deceased" consumer.

63. Defendants will only remove a deceased consumer's file from their respective databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

64. Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

65. Defendants profit from the sale of reports on deceased consumers.

66. Defendants know that truly deceased consumers do not apply for credit such as credit cards, loans, or rental properties.

67. Defendants know that the consumer information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendants to be a common and major source of identity theft.

12

68.    Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

69.    Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the consumer reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

70.    Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

71.    Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

72.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendants to sell their consumer reports, absent a court order.

73.    Defendants know that such reports contain a vast amount of personal identifying and consumer information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### The FCRA's Protections For Housing Applicants

74.    Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates tenant screening reports like the ones RentGrow and Appfolio prepared in Plaintiff's name.

75.    The FCRA provides a number of protections for housing applicants who are the

subject of tenant screening reports for the purpose of securing housing and credit.

76.    In the parlance of the FCRA, tenant screening reports are "consumer reports," and providers of tenant screening reports, like RentGrow and Appfolio, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

77.    The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

78.    Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

79.    Defendants disregarded their respective duties under the FCRA with respect to Plaintiff's consumer reports.

**Plaintiff Applies for Credit with USAA Federal Savings Bank**

80.    In August 2023, Plaintiff cosigned a personal loan with his daughter. As a father, Plaintiff wanted to support his daughter financially and believed that his being on the application would result in a lower interest rate/more favorable terms.

81.    On or about August 10, 2023, Plaintiff and his daughter completed and submitted a personal loan application with non-party USAA Federal Savings Bank ("USAA") by telephone.

82.    Plaintiff provided all of his personal identification information, including his social security number, to USAA and authorized it to obtain his credit reports and/or credit scores.

83.    On or about August 10, 2023, Experian sold a consumer report about Plaintiff to USAA in response to his credit application.

/ /

14

**USAA Denies Plaintiff's Credit Application**

84. Shortly after submitting his credit application, on or about August 10, 2023, Plaintiff was denied for the personal loan because USAA was unable to verify Plaintiff's identity.

85. Upon information and belief, USAA was unable to verify Plaintiff's identity because Defendant Experian was reporting Plaintiff as deceased on his consumer report.

86. Upon information and belief, USAA denied Plaintiff's credit application based on Experian's inaccurate consumer report about Plaintiff.

87. Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

88. Plaintiff was embarrassed and humiliated that he could not provide for his own daughter.

**Plaintiff Re-Applies for Credit with USAA**

89. On or about August 10, 2023, Plaintiff and his daughter submitted a second application with USAA by telephone.

90. Plaintiff once again provided all of his personal identification information, including his social security number, to USAA and authorized it to obtain his credit reports and/or credit scores.

91. Upon information and belief, on or about August 10, 2023, Experian sold a second consumer report concerning Plaintiff to USAA in response to his credit application.

**USAA Denies Plaintiff's Credit Application Again**

92.    Shortly after submitting his credit application, on or about August 10, 2023, Plaintiff was denied for the personal loan because USAA was unable to verify Plaintiff's identity.

15

93. Upon information and belief, USAA was unable to verify Plaintiff's identity because Defendant Experian was reporting Plaintiff as deceased on his consumer report.

94. Upon information and belief, USAA denied Plaintiff's credit application based on Experian's inaccurate consumer report about Plaintiff.

95. Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Obtains His Consumer Report and Confirms the Deceased Notation**

96. During the call with USAA, wherein USAA denied Plaintiff's credit application for the second time, USAA informed Plaintiff that he should review his consumer reports.

97. Thereafter, Plaintiff reviewed a copy of his Experian consumer report.

98. Upon review, Plaintiff observed that there was a deceased notation on his credit file.

99. Plaintiff was shocked; he is clearly alive.

**Plaintiff Applies for Apartments in August 2023**

100. Sometime in or around August 2023, Plaintiff's daughter was trying to find an apartment. As many parents do, Plaintiff proudly offered to serve as a cosigner for his daughter's application in hopes that doing so would substantially increase the likelihood that her application was approved.

101. Given that Plaintiff is clearly alive, he believed Experian's inaccurate reporting was a fluke, and accordingly, did not believe he would have any issue getting approved for an apartment.

102. On or about August 24, 2023, Plaintiff submitted rental applications with two

16

property management companies: (1) Scott Properties Group ("Scott Properties") and (2) Westside Habitats, LLC ("Westside").

103. Plaintiff's daughter's first choice was the property with Scott Properties.

**Appfolio Published an Inaccurate Tenant Screening Report to Scott Properties**

104. Plaintiff provided all of his personal identification information, including his social security number, to Scott Properties and authorized it to obtain his tenant screening report.

105. Scott Properties contracted with Appfolio to conduct tenant screening on prospective tenants to determine whether the prospective tenant is eligible to rent an apartment.

106. Within those consumer reports, Appfolio includes a compilation of the prospective tenants' credit histories, criminal histories, and civil records histories.

107. Accordingly, Appfolio also contracts with Experian to obtain credit histories and information on the consumers in which it prepares tenant screening reports.

108. On or about August 24, 2023, Scott Properties ordered a tenant screening report on Plaintiff from Appfolio.

109. On or about August 24, 2023, Experian sold a consumer report about Plaintiff to Appfolio, wherein Experian published information including a compilation of Plaintiff's credit history.

110. Within that consumer report, Experian published inaccurate information about Plaintiff which included a deceased notation.

111. On or about August 24, 2023, Appfolio sold a tenant screening report about Plaintiff to Scott Properties, wherein Appfolio published information including a compilation of Plaintiff's credit history, criminal history, and civil records history.

112. The tenant screening report, identified as a "Tenant Screening Report" by Appfolio,

17

is a consumer report regulated by the FCRA.

113.    Within that tenant screening report, Appfolio published inaccurate information about Plaintiff.

114.    Specifically, Appfolio's tenant screening report about Plaintiff included a grossly inaccurate and stigmatizing deceased notation, which appeared in the tenant screening report as follows:

| Creditor | Type | Status | Last Updated | Origination Date | High Credit/ Original Amt. | Current Balance | Past Due Amt. | Delinquency (2 yrs.) | |
|---|---|---|---|---|---|---|---|---|---|
| CAPITAL ONE | Revolving | Unknown | 03/31/2020 | 07/20/2016 | $1,605 | $0 | — | 30+ days: | 0 |
| | | | | | | | | 60+ days: | 0 |
| | | | | | | | | 90+ days: | 0 |

CREDIT CARD; CONSUMER REPORTED AS DECEASED; CONSUMER REPORTED AS DECEASED; ACCOUNT CLOSED AT CONSUMER'S REQUEST

115.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

116.    Appfolio violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

### Scott Properties Denies Plaintiff's Housing Application

117.    Shortly thereafter, Plaintiff learned that he had been denied for the apartment.

118.    Scott Properties denied Plaintiff's application because Defendants Experian and Appfolio were inaccurately reporting Plaintiff as deceased on his consumer report.

119.    Upon information and belief, Plaintiff would have been more likely to get approved for the rental unit with Scott Properties had Experian and Appfolio not reported that he was deceased.

/ /

18

**Appfolio Published an Inaccurate Tenant Screening Report to Westside Habitats**

120.    Plaintiff provided all of his personal identification information, including his social security number, to Westside and authorized it to obtain his tenant screening report.

121.    Westside contracted with Appfolio to conduct tenant screening on prospective tenants to determine whether the prospective tenant is eligible to rent an apartment.

122.    Within those consumer reports, Appfolio includes a compilation of the prospective tenants' credit histories, criminal histories, and civil records histories.

123.    Accordingly, Appfolio also contracts with Experian to obtain credit histories and information on the consumers in which it prepares tenant screening reports.

124.    On or about August 24, 2023, Westside ordered a tenant screening report on Plaintiff from Appfolio.

125.    On or about August 24, 2023, Experian sold a consumer report about Plaintiff to Appfolio, wherein Experian published information including a compilation of Plaintiff's credit history.

126.    Within that consumer report, Experian published inaccurate information about Plaintiff which included a deceased notation.

127.    On or about August 24, 2023, Appfolio sold a tenant screening report about Plaintiff to Westside, wherein Appfolio published information including a compilation of Plaintiff's credit history, criminal history, and civil records history.

128.    The tenant screening report, identified as a "Tenant Screening Report" by Appfolio, is a consumer report regulated by the FCRA.

129.    Within that tenant screening report, Appfolio published inaccurate information about Plaintiff.

130.    Specifically, Appfolio's tenant screening report about Plaintiff included a grossly inaccurate and stigmatizing deceased notation, which appeared in the tenant screening report as follows:

| Creditor | Type | Status | Last Updated | Origination Date | High Credit/ Original Amt. | Current Balance | Past Due Amt. | Delinquency (2 yrs.) | |
|---|---|---|---|---|---|---|---|---|---|
| **CAPITAL ONE** | Revolving | Unknown | 03/31/2020 | 07/20/2016 | $1,605 | $0 | — | 30+ days: | 0 |
| | | | | | | | | 60+ days: | 0 |
| | | | | | | | | 90+ days: | 0 |

CREDIT CARD; CONSUMER REPORTED AS DECEASED; CONSUMER REPORTED AS DECEASED; ACCOUNT CLOSED AT CONSUMER'S REQUEST

131.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

132.    Appfolio violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Westside Habitats Decisions Plaintiff's Rental Application**

133.    Shortly thereafter, Plaintiff learned his application was denied.

134.    Westside denied Plaintiff's application because Defendants Experian and Appfolio were inaccurately reporting Plaintiff as deceased on his consumer reports.

135.    However, fortunately, and no thanks to Experian or Appfolio, Westside was ultimately able to overturn its decision and approve Plaintiff for the apartment based on his Trans Union consumer report. Plaintiff's Trans Union consumer report did not indicate he was deceased.

**Plaintiff Applies for an Apartment with Axis Apartments in February 2024**

136.    In or around February 2024, Plaintiff's daughter decided to move back to the Dallas, Texas area.

137.    Plaintiff was happy his daughter was returning and wanted his daughter to live in

an apartment that was in a safe neighborhood, clean, and affordable.

138. In or around late February 2024, Plaintiff and his daughter located the perfect apartment: Axis 3700 Apartments ("Axis").

139. Specifically, the two liked how clean and safe the apartment was, the location, and the amenities.

140. Plaintiff was certain the inaccurate deceased reporting was a fluke as he is clearly alive.

141. Plaintiff knew his daughter had a limited credit history at the time and wanted to be approved for the apartment with Axis.

142. Accordingly, Plaintiff, as a father who wanted to help his daughter in any way he could, applied with Axis. Plaintiff anticipated adding his daughter to the lease sometime thereafter.

143. Plaintiff submitted and completed his application with Axis and paid the application fee on or before February 20, 2024.

**RentGrow Published an Inaccurate Tenant Screening Report to Axis**

144. Plaintiff provided all of his personal identification information, including his social security number, to Axis and authorized it to obtain his tenant screening report.

145. Axis contracted with RentGrow to conduct tenant screening on prospective tenants to determine whether the prospective tenant is eligible to rent an apartment.

146. Within those consumer reports, RentGrow includes a compilation of the prospective tenants' credit histories, criminal histories, and civil records histories.

147. Accordingly, RentGrow also contracts with Experian to obtain credit histories and information on the consumers in which it prepares tenant screening reports.

148. On or about February 23, 2024, Axis ordered a tenant screening report on Plaintiff

from RentGrow.

149.    On or about February 23, 2024, Experian sold a consumer report about Plaintiff to RentGrow, wherein Experian published information including a compilation of Plaintiff's credit history.

150.    Specifically, Experian published inaccurate information about Plaintiff which included a deceased notation.

151.    On or about February 23, 2024, RentGrow sold a tenant screening report about Plaintiff to Axis, wherein RentGrow published information including a compilation of Plaintiff's credit history, criminal history, and civil records history.

152.    The tenant screening report, identified as a "Screening Report" by RentGrow, is a consumer report regulated by the FCRA.

153.    Within that tenant screening report, RentGrow published inaccurate information about Plaintiff.

154.    Specifically, RentGrow's tenant screening report about Plaintiff included a grossly inaccurate and stigmatizing deceased notation, which appeared in the tenant screening report as follows:

Risk Score Details

Risk Score: Not Available (File/Trade indicating consumer is deceased-0001)

and

CAPITAL ONE (Sub# 1270246)

Account type: Credit card                                                          Responsibility: Deceased

/ /

22

155.    In preparing and selling a consumer report about Plaintiff, wherein Defendant Experian published to RentGrow inaccurate information about Plaintiff, Defendant Experian failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

156.    In preparing and selling a consumer report about Plaintiff, wherein Defendant RentGrow published to Plaintiff's prospective landlord inaccurate information about Plaintiff, Defendant RentGrow failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

## Axis Denies Plaintiff's Housing Application

157.    On or about February 23, 2024, Plaintiff received a letter from Axis stating that his housing application was conditionally approved.

158.    Plaintiff also obtained a copy of the tenant screening report. However, he was shocked and humiliated upon reviewing and realizing that there was a deceased notation published in the tenant screening report RentGrow sold about Plaintiff to Axis.

159.    Shortly thereafter, and despite having been conditionally approved, Plaintiff was notified by Axis that until he corrected the deceased notation on his tenant screening report, he could not move-in.

160.    Plaintiff was very panicked, confused, and concerned about the impact of the deceased notation being reported on the tenant screening report – specifically, the impact of the same on his future.

## Plaintiff Disputed the Inaccurate Deceased Notation With RentGrow

161.    Plaintiff, desperate to secure housing with Axis and riddled with worry over the far-reaching impacts of the inaccurate information, Plaintiff called RentGrow.

23

162.  On or about February 26, 2024, Plaintiff disputed with RentGrow by telephone.

163.  Plaintiff explained that any notation that he was deceased was inaccurate as he was alive, evidenced by his phone call, among other things.

164.  Plaintiff requested that RentGrow reinvestigate the disputed information, correct the reporting, and send a corrected copy of his report.

### Plaintiff Obtains His Consumer Report and Confirms the Deceased Notation

165.  On or about February 29, 2024, Plaintiff once again obtained a copy of his consumer report.

166.  Upon review, Plaintiff confirmed that the deceased notation was *still* on his Experian credit file, despite his numerous recent credit applications.

167.  Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

### Plaintiff Attempted to Dispute the Inaccurate Deceased Notation With Experian

168.  On or about February 29, 2024, Plaintiff called Experian.

169.  Plaintiff attempted to dispute, however, he was unable to get ahold of anyone.

170.  Plaintiff was beyond frustrated.

### Plaintiff Reaches Out to Axis

171.  As of March 4, 2024, Plaintiff had not heard back from RentGrow regarding his dispute, and had not been able to resolve the deceased reporting with Experian either.

172.  Accordingly, Plaintiff reached out to Axis to see if there was anything it could do to approve him, as he was clearly not deceased.

173.  On or about March 5, 2024, Axis informed Plaintiff that it could not move forward

24

with Plaintiff's application until the dispute is resolved.

174.    Axis also stated that, at this time, it must deny Plaintiff's application, but that he could re-apply once his report was corrected.

**RentGrow Removes the Inaccurate Deceased Notation From Plaintiff's Tenant Screening Report**

175.    On or about March 19, 2024, Plaintiff received a dispute response from RentGrow.

176.    RentGrow's dispute response contained an updated Experian report which showed that the deceased notation was removed from Plaintiff's report.

177.    Now that the report was corrected, Plaintiff was eager to get the ball rolling with Axis again.

178.    However, Plaintiff was informed that there were no other studio apartments available for rent at that time.

179.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

180.    RentGrow violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

181.    Due to Defendants' unreasonable procedures, Plaintiff was denied credit, specifically a USAA personal loan and multiple apartments.

182.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

183.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

184.    Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants' violations of the FCRA are willful.

185.    The injuries suffered by Plaintiff as a direct result of Defendants' erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendants' conduct would have given rise to causes of action based on defamation and invasion of privacy.

186.    As a result of Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of credit; loss of housing opportunities; loss of time trying to correct the tenant screening report; loss of ability to purchase and benefit from his credit rating; the expenditure of time disputing and trying to correct the inaccurate reporting; detriment to his credit rating; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

187.    As a direct result of Defendants' conduct, there is tension between Plaintiff and his daughter. After the Axis denial, Plaintiff's daughter moved in with him. Plaintiff's apartment has only one bedroom. Therefore, Plaintiff slept on the reclining chair.

188.    Plaintiff also feels as though he is unable to support his daughter.

189.    The inaccurate reporting has caused Plaintiff to suffer from anxiety, stress, and frustration. Consequently, Plaintiff suffers from headaches and sleepless nights.

190.    Further, Plaintiff is worried that he may never be able to get approved for credit again. Plaintiff has refrained from submitting further credit applications out of sheer fear that the Defendants will continue to report the inaccurate deceased notations and cause additional harm. Therefore, Plaintiff also suffers from financial insecurity.

191.    Plaintiff's time was also wasted as a result of Defendants' conduct. Plaintiff estimates he spent 5-10 hours dealing with the inaccurate reporting.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

192.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

193.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

194.    On no less than four occasions, Defendant Experian prepared patently false consumer reports concerning Plaintiff.

195.    On at least two occasions, Defendant Appfolio prepared patently false consumer reports concerning Plaintiff.

196.    On at least one occasion, Defendant RentGrow prepared patently false consumer reports concerning Plaintiff.

197.    Despite actual and implied knowledge that Plaintiff is not dead, Defendants readily

27

sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

198.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer reports it sold about Plaintiff as well as the information it published within the same.

199.    Defendant RentGrow violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the tenant screening report it sold about Plaintiff as well as the information it published within the same.

200.    Defendant Appfolio violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the tenant screening reports it sold about Plaintiff as well as the information it published within the same.

201.    As a result of Defendants' violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of credit; loss of housing opportunities; loss of time trying to correct the tenant screening report; loss of ability to purchase and benefit from his credit rating; the expenditure of time disputing and trying to correct the inaccurate reporting; detriment to his credit rating; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

202.    Defendants willfully violated 15 U.S.C. § 1681e(b) in that their respective conduct, actions, and inactions were willful, rendering them individually liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C.

§ 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

203.    Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

i.      Determining that Defendants negligently and/or willfully violated the FCRA;

ii.     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

**iv.**     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


RESPECTFULLY SUBMITTED on this 3rd day of January 2025.

CONSUMER JUSTICE LAW FIRM

By: /s/ McKenzie Czabaj
McKenzie Czabaj, AZ Bar No. 036711
8095 North 85th Way
Scottsdale, Arizona 85258
Phone: (480) 626-2376
Fax: (480) 613-7733
Email: mczabaj@consumerjustice.com

*Attorneys for Plaintiff Dan Arenberg*

29